**ORAL ARGUMENT NOT YET SCHEDULED**
Case No. 24-1170 (lead)
(consolidated with Nos. 24-1171, 24-1177)

# United States Court of Appeals
# For the District of Columbia Circuit

### CLEVELAND-CLIFFS INC.

*Petitioner*,

v.

### U.S. ENVIRONMENTAL PROTECTION AGENCY AND MICHAEL S. REGAN, ADMINISTRATOR, U.S. EPA,
*Respondents*.

**On Petition for Judicial Review of a Final Rule of the Environmental Protection Agency, 89 Fed. Reg. 23,294 (April 3, 2024)**

**JOINT PETITION FOR REHEARING *EN BANC*
OF ORDER DENYING MOTIONS FOR STAY**

Lianne Mantione
Douglas A. McWilliams
Allen A. Kacenjar
Squire Patton Boggs (US) LLP
1000 Key Tower, 127 Public Square
Cleveland, OH 44114
Telephone: (216) 479-8500
lianne.mantione@squirepb.com

John D. Lazzaretti
Squire Patton Boggs (US) LLP
1000 Key Tower, 127 Public Square
Cleveland, OH 44114
Telephone: (216) 479-8500
john.lazzaretti@squirepb.com

*Counsel for Petitioner*
*Cleveland-Cliffs Inc.*

*Counsel for Petitioner*
*United States Steel Corporation*

December 6, 2024

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................. I

TABLE OF AUTHORITIES .................................................... II

GLOSSARY ........................................................................... III

INTRODUCTION AND RULE 35(B)(2) STATEMENT ....................................... 1

BACKGROUND ................................................................... 3

ARGUMENT FOR *EN BANC* REVIEW ............................................... 8

   I.   *En Banc* Rehearing is Warranted Because the Panel Majority's Decision Allows EPA's Material Errors, Omissions and Misinterpretation of CAA §112(d) to Stand Contrary to the Supreme Court's Instruction in *Loper Bright*...8

   II.  Preventing Harm to Industry Workers and Community at Large Is an Issue of Exceptional Importance Warranting Rehearing *En Banc*. ............................12

   III. The Panel Majority's Failure to Recognize the Severe Harm Posed to the Domestic Steel Industry Absent a Stay is an Issue of Exceptional Importance..15

CONCLUSION ...................................................................... 17

CERTIFICATE OF COMPLIANCE ......................................... 18

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ...........19

DISCLOSURE STATEMENT PURSUANT TO RULE 26.1 ...............................20

CERTIFICATE OF SERVICE ............................................... 22

# TABLE OF AUTHORITIES

Cases

*Earth Island Inst. v. Hogarth*, 494 F.3d 757 (9th Cir. 2007).....................................9
*La. Envt'l Action Network v. EPA*, 955 F3d 1088 (D.C. Cir. 2020)................ 4, 5, 6
*Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024) ...........................1, 8
*Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29 (1983) ...........................................................................9
*Nat'l Ass'n for Surface Finishing v. EPA*, 795 F.3d 1 (D.C. Cir. 2015) ..............4, 9
*Ohio v. EPA*, 603 U.S. 279 (2024)...........................................................................15
*Sierra Club v. EPA,* 167 F.3d 658 (D.C. Cir. 1999)...........................................4, 10
*Util. Air. Regul. Grp. v. EPA*, 573 US 302 (2014) ...............................................8


Statutes

CAA §101(b)(1)......................................................................................................14
CAA §112(d)............................................................................................................3
CAA §112(d)(1).....................................................................................................3, 9
CAA §112(d)(1)-(3)...............................................................................................3, 9
CAA §112(d)(2)..................................................................................... 3, 10, 11
CAA §112(d)(2)-(3).............................................................................................9, 10
CAA §112(d)(3)...................................................................... 3, 4, 5, 10, 11
CAA §112(d)(3)(B)..................................................................................................10
CAA §112(d)(6)........................................................................... 4, 5, 6, 9
CAA §112(f) ..............................................................................................................4
CAA §112(f)(2).........................................................................................................5
CAA §112(r) ...........................................................................................................13
CAA §113(c)(1)........................................................................................................13
CAA §307(d)...................................................................................... 9, 11, 12
CAA §307(d)(6).........................................................................................................6


Other Authorities

40 CFR 63.6(e)........................................................................................................13
68 Fed. Reg. 27,646 (May 20, 2023) .......................................................................4
85 Fed. Reg. 42,074 (July 13, 2020)........................................................................5
89 Fed. Reg. 16,408 (March 6, 2024).....................................................................16
89 Fed. Reg. 23,294 (April 3, 2024)........................................ 1, 5, 6, 9, 16
89 Fed. Reg. 55,684 (July 5, 2024).........................................................................16
D.C. Circuit Rule 35 .................................................................................................8
Fed. R. App. Proc. 35...........................................................................................1, 8
H.R. Rep. No. 101-490(I), at 328 (1990) ....................................................... 11, 13

# GLOSSARY

<u>Terms</u>

| | |
|---|---|
| ACI | Activated Carbon Injection |
| CAA | Clean Air Act |
| EPA | U.S. Environmental Protection Agency |
| HAP | Hazardous Air Pollutant |
| II&S | Integrated Iron and Steel |
| MACT | Maximum Achievable Control Technology |
| NESHAP | National Emission Standards for Hazardous Air Pollutants |
| UFIP | Unmeasurable Fugitive and Intermittent Particulate |

## INTRODUCTION AND RULE 35(B)(2) STATEMENT

This case presents a question of exceptional importance: Can EPA through its own impatience and hubris ignore the input in the record of regulated industry, bypass statutory requirements, and impose unachievable emission standards on an industry that is key to critical infrastructure and economic security? One panel judge found EPA's final action so egregious that it warrants a stay of EPA's *National Emission Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities Technology Review*, 89 Fed. Reg. 23,294 (April 3, 2024) ("Final Rule") while the Court decides the merits of this question. A stay of the Final Rule is urgently needed with initial compliance deadlines in April 2025 looming. Rehearing *en banc* of a divided panel's decision to deny the stay sought by Petitioners Cleveland-Cliffs Inc. ("Cleveland-Cliffs") and United States Steel Corporation ("U. S. Steel") is warranted because "the proceeding involves a question of exceptional importance." Fed. R. App. Proc. 35.

Rehearing *en banc* is also warranted when such consideration is "necessary to secure or maintain uniformity of the court's decisions." *Id*. The Supreme Court's overruling of *Chevron* deference earlier this year in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024) ("*Loper Bright*"), requires courts to correct rules founded on an agency's misinterpretation of its statutory authority. Without a stay, the intent of *Loper Bright* is frustrated as EPA can continue to deviate from statutory

authority by relying on *Chevron* deference to enforce rules pending review based on that flawed interpretation. A rehearing *en banc* presents the opportunity for the full court to secure a uniform approach to staying rules that rely on now-overruled *Chevron* deference.

In the Final Rule, EPA ignored its statutory obligations to change emission standards only as necessary; to use all available, valid data in setting new emission standards; and to allow for and consider public comment on novel cost-effectiveness determinations for revised emission limits and fenceline monitoring requirements. EPA also rejected industry's superior technical expertise to conclude contrary to record evidence that no new technology will be required to achieve compliance, or to otherwise assume cost-effectiveness of control technology in a manner divorced from reality. EPA has itself recognized multiple flaws in the Final Rule, informing Petitioners and this Court in August that it would soon issue corrections and reconsider multiple issues – notices that have still not been issued despite April 2025 deadlines looming. The panel majority's decision effectively gives EPA carte blanche to enforce a Final Rule that violates fundamental obligations under Clean Air Act ("CAA").

The panel majority's stay denial also presents questions of exceptional importance. In EPA's haste to promulgate this Final Rule, it imposed standards that compromise worker safety and threaten public health. The legally flawed Final Rule

- 2 -

also imposes imminent and unrecoverable costs on Petitioners. The implications fall well beyond the iron and steel industry, with real-world consequences impacting national priorities, global economic competitiveness, and environmental protection by shifting global production to much higher emitting facilities in China and elsewhere around the globe. Rehearing *en banc* is necessary to overturn the panel majority's erroneous stay denial and prevent these far-reaching harmful effects.

## BACKGROUND

CAA §112(d)(1)-(3) establishes the process for setting national emission standards for hazardous air pollutants ("NESHAP"). First, §112(d)(1) instructs EPA to promulgate emissions standards. Second, §112(d)(2) describes how EPA is to set standards, "requir[ing] the maximum degree of reduction in emissions" of hazardous air pollutants ("HAPs") based on existing technology that is "achievable" after considering "the cost of achieving such emission reduction, and any non-air quality health and environmental impacts and energy requirements." Finally, §112(d)(3) provides that existing source emissions standards set under §112(d)(2) should not be lower than the average of any emissions limitations already imposed on the source category.

Standards established under CAA §112(d) are referred to as maximum achievable control technology ("MACT") where "achievable" shall "not be less stringent than the emission control that is achieved in practice by the best controlled

similar source." CAA §112(d)(3). Achievability of these standards is measured, for the best controlled similar sources, "under the worst reasonably foreseeable circumstances" and/or "under most adverse circumstances which can reasonably be expected to occur." *Sierra Club v. EPA,* 167 F.3d 658, 665 (D.C. Cir. 1999). After a NESHAP is initially promulgated, EPA conducts a one-time risk review to determine if additional requirements are needed.  CAA §112(f).

Once a NESHAP and risk review are promulgated, CAA "Section 112(d)(6) review is the sole periodic, ongoing review of emission standards the Act requires." *La. Envt'l Action Network v. EPA*, 955 F. 3d 1088, 1099 (D.C. Cir. 2020 ("*LEAN*"). CAA §112(d)(6) provides for eight-year "technology reviews," expressly limiting EPA to making changes that are "necessary (taking into account developments in practices, processes, and control technologies)." Determining whether a change is "necessary" includes evaluating "'improvements in efficiency, reduced costs or other changes that indicate a previously considered option for reducing emissions that may now be cost effective or technologically feasible.'" *Nat'l Ass'n for Surface Finishing v. EPA*, 795 F.3d 1, 11 (D.C. Cir. 2015) (quoting 77 Fed. Reg. at 58,231); *see also LEAN,* 955 F.3d at 1097. A summary of how EPA deviated from this statutory obligation is outlined below and within Petitioners' motions for stay.

EPA first promulgated NESHAPs for the integrated iron and steel source category in 2003. *See* 68 Fed. Reg. 27,646 (May 20, 2003). In 2020, EPA satisfied

its statutory requirements under CAA §§112(d)(6) and (f)(2), promulgating a combined residual risk and technology review. *See* 85 Fed. Reg. 42,074 (July 13, 2020). EPA determined that "risks due to emissions of air toxics from this source category are acceptable and that the current NESHAP provides an ample margin of safety" to protect public health and the environment. *Id.* It also determined that "no developments in practices, processes, or control technologies…necessitate revision of the standards." *Id.* Separately, in 2020, the D.C. Circuit issued its decision in *LEAN*, finding that EPA is required to address unregulated HAPs during technology reviews. *See* 955 F.3d at 1088.

In 2024, EPA conducted another technology review. Final Rule, at 23,294. The Final Rule does not disturb EPA's 2020 finding of acceptable risk, but establishes new emission limits for numerous HAPs at blast furnaces, basic oxygen process furnaces, and sinter/recycling plants; and opacity limits, operating limits, and work practice standards for five Unmeasurable Fugitive and Intermittent Particulate ("UFIP") sources (unplanned blast furnace bleeder valve openings; planned bleeder valve openings; blast furnace bell leaks; iron beaching; and slag processing, handling and storage operations).

EPA made no attempt to establish that amendments are "necessary" under §112(d)(6) based on any development and failed to consider costs in setting new emission standards under §112(d)(3). *See* EPA Response, #2070301, pp.24-25. EPA

simply asserted – incorrectly – that there had been technological developments and pointed to data identifying the presence of HAPs it argues were previously unregulated to conclude that, "pursuant to section 112 of the CAA and the *LEAN* court decision, we must promulgate MACT emissions limits based on available data in order to fulfill our court ordered CAA section 112(d)(6) obligations." Final Rule at 23,309. EPA erroneously concluded, "based on the limited data we have, we estimate that all facilities will be able to meet these limits without the need for new add-on control devices (*e.g.*, we have no data indicating a source cannot currently comply with these limits). Nevertheless, we acknowledge that there are uncertainties because of the limited data." *Id*. In fact, EPA ignored voluminous data from industry experts documenting that the new limits are not achievable by the best performing sources.[1]

Petitioners timely sought administrative reconsideration and stay and petitioned for judicial review of the Final Rule. They also promptly filed motions for judicial stay demonstrating each element of the stay standard—the likelihood of success on the merits due to Respondents' failure to follow the plain language and legislative intent of the CAA; imminent harmful effects to workers from

---

[1] Additionally, despite considering costs for the sinter/recycling plant revised "beyond-the-floor" limits, EPA admits its cost-effectiveness assessment – which considered all pollutants together – was published after the public comment period, in violation of CAA §307(d)(6). *See* EPA Response, #2070301, at 30.

implementation of dangerous limitations on safety devices and to the public from pilot testing to develop novel technology; and imminent and irreparable harm to industry due to the Final Rule's unachievable standards.

On October 24, 2024, a divided panel denied a stay. Order, #2081727. The panel majority offered only a single statement in explanation, that the motion for stay did not meet the "stringent requirements for a stay pending court review." *Id*. at 1. That summary decision overlooked evidence that EPA committed material errors, made omissions, and relied on misinterpretations of the CAA that depended on overruled *Chevron* deference to create a fatally flawed Final Rule that is unachievable and that results in imminent and irreparable harm to Petitioners, the integrated iron and steel industry, its workers, surrounding communities, and the national economy.

The panel's dissent recognized a few of the Agency's many failings, noting the strong example that EPA "likely violates the Clean Air Act by using fewer than 5 sources to set emission floors," and that this material error will "likely cause irreparable harm" to Petitioners through technology-forcing behavior and failure to consider the costs of such untested technology to the industry. *Id.* at 3 (Walker, J. dissenting). Allowing EPA to ignore its statutory obligations here also emboldens the Agency to do the same in other rules contrary to the Supreme Court's mandate

in *Loper Bright*. Therefore, pursuant to Federal Rule of Appellate Procedure 35 and

D.C. Circuit Rule 35, Petitioners respectfully request rehearing *en banc*.

**ARGUMENT FOR *EN BANC* REVIEW**

I.  ***En Banc* Rehearing is Warranted Because the Panel Majority's Decision Allows EPA's Material Errors, Omissions and Misinterpretation of CAA §112(d) to Stand Contrary to the Supreme Court's Instruction in *Loper Bright*.**

In their motions for stay, Petitioners presented multiple justifications for

establishing success on the merits, including that EPA relied on a longstanding

misinterpretation of the CAA which cannot stand. The panel dissent recognized what

the panel majority did not: The Final Rule is fatally flawed and should be stayed.

Rehearing *en banc* to evaluate a stay under these circumstances is necessary to

prevent EPA from issuing final rules that contradict the statutory text of the CAA,

causing imminent irreparable harm across numerous industry sectors.

EPA must follow the CAA and interpret the provisions "with a view to their

place in the overall statutory scheme." *Util. Air. Regul. Grp. v. EPA*, 573 US 302,

322 (2014) (quotation omitted). EPA can no longer support contorted statutory

interpretations after the Supreme Court overruled *Chevron* deference in *Loper*

*Bright*, 144 S. Ct. 2244, 2273 (2024). In reviewing Agency decision-making, the

Court must "exercise [its] independent judgment," 144 S. Ct. at 2273, and follow

established precedent across circuit courts that "[a]n agency may not ignore factors

- 8 -

Congress explicitly required to be taken into account." *See, e.g., Earth Island Inst. v. Hogarth*, 494 F.3d 757, 765 (9th Cir. 2007).

Here, the Agency ignored factors it was explicitly required to address by the statute. This resulted in a Final Rule that EPA failed to establish was necessary under CAA §112(d)(6), and which imposed requirements that failed to meet the full statutory requirements of §112(d)(2)-(3). EPA also fell short of its independent obligation under CAA §307(d) to ensure the rule is based on data in the record and to respond fully to public comments.

CAA §112(d)(6) expressly limits EPA to making changes that are "necessary (taking into account developments in practices, processes, and control technologies)" including whether such changes are cost effective or technologically feasible. *See Nat'l Ass'n for Surface Finishing*, 795 F.3d 1, 11; *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Automobile Ins. Co*., 463 U.S. 29, 43 (1983). EPA failed to follow this statutory mandate, making no assessment of whether each emission limit and operating requirement in the Final Rule was necessary under CAA §112(d)(6). *See* Final Rule at 23,309. This failure to meet the plain statutory requirement of "necessity" alone is a fatal flaw that demonstrates Petitioners will succeed on the merits of this appeal.

EPA relied instead on a misinterpretation of its statutory authority under CAA §112(d)(1)-(3) that may have survived under the now-overruled *Chevron* deference

standard. But the statute is clear. First, §112(d)(1) instructs EPA to promulgate emissions standards. Second, §112(d)(2) describes how EPA is to set standards, "requir[ing] the maximum degree of reduction in emissions" of HAPs based on existing technology that is "achievable" after considering "the cost of achieving such emission reduction, and any non-air quality health and environmental impacts and energy requirements." Achievability of these "maximum achievable control technology" ("MACT") standards is measured "under the worst reasonably foreseeable circumstances" and/or "under most adverse circumstances which can reasonably be expected to occur" for the best controlled similar sources. *Sierra Club v. EPA,* 167 F.3d 658, 665 (D.C. Cir. 1999). Finally, CAA §112(d)(3) provides that existing source emissions standards set under §112(d)(2) may not be lower than the average of any emissions limitations already imposed on the source category. For "source categories or subcategories with fewer than 30 sources" the standard is set by "the average emission limitation achieved by the best performing 5 sources." CAA §112(d)(3)(B).

EPA failed to follow the statutory mandates in CAA §§112(d)(2)-(3) when establishing emission limits. The panel dissent highlighted one such fatal error, pointing out the Agency "likely violates the Clean Air Act by using fewer than 5 sources to set emission floors," and that it relies shakily on the use of "potential outliers." Order, #2081727, at 3 (Walker, J., dissenting). As Petitioners established

in the motion for stay briefing, EPA had valid and timely data for the best performing 5 sources available for several pollutants but failed to use it in establishing floor emission limits. The valid data EPA ignored was ***four times higher*** than the standard ultimately set in the Rule, showing EPA indeed had relied on "outliers" as Judge Walker raised. Disregarding that data artificially lowered the limit. *See* Cleveland-Cliffs' Mot. for Stay Reply, #2075786, pp.9-10, Ex. M, ¶10.

The panel dissent also recognized EPA's failure to analyze costs in setting achievable MACT floors, as explicitly required by CAA §112(d)(3) and reinforced by legislative history.[2] The Agency acknowledged it did not consider costs in setting emission standards under §112(d)(3), relying on continued deference to an erroneous statutory interpretation it made over the years. *See* EPA Response at 24-25.  Even in the limited case where the Agency did look at costs, EPA denied Petitioners the opportunity to comment on the flawed approach where EPA combined emissions from three different pollutants to justify setting "beyond-the-floor" limits under §112(d)(2) for sinter/recycling plants contrary to CAA §307(d).  Furthermore, EPA chose its own technical "expertise", disregarding voluminous data and comments provided by actual industry experts to erroneously apply control efficiencies that

---

[2] The U.S. House Committee on Energy and Commerce explained: "In the determination of MACT for new and existing sources, consideration of cost should be based on an evaluation of the cost of various control options." H.R. Rep. No. 101-490(I), at 328 (1990).

artificially inflated projected emissions reductions and reduced cost effectiveness, including to justify further emission reductions from existing MACT sinter/recycling plant sources. *See, e.g.*, Cleveland-Cliffs' Mot. for Stay, #2062303, Ex. D, E; Cleveland-Cliffs' Mot. for Stay Reply, #2075786, Ex. M. This unlawful method in establishing "beyond-the-floor" limits is contrary to CAA §307(d), and results in establishing emission limits that cannot be achieved without investing in novel technology that is not cost effective and may be technically infeasible to achieve. *See* Cleveland-Cliffs' Mot. for Stay, #2062303, Ex. E; *Comments of the American Iron and Steel Institute and U. S. Steel* (Sept. 29, 2023), §III, EPA-HQ-OAR-2002-0083-1628-29.

The dissent has it right. Rulemaking that deviates this significantly from the CAA requires a stay pending judicial review from this Court. Rehearing *en banc* is necessary to address the panel majority's error.

## II. Preventing Harm to Industry Workers and Community at Large Is an Issue of Exceptional Importance Warranting Rehearing *En Banc*.

The panel majority's failure to stay the Final Rule is an issue of exceptional importance as it harms a strategically vital industry, its workers, and the community at large.  First, the panel majority's decision leaves communities and workers at risk by forcing the industry to limit critical safety valve openings at its blast furnaces. Risk of harm does not stop at the borders of the facility and extends into surrounding communities. The CAA, legislative history, and even the Agency's own

implementing regulations deem safety paramount in establishing standards for control equipment. The General Duty Clause in CAA §112(r) requires regulated entities to maintain safe facilities, and the implementing regulations in 40 CFR 63.6(e) explain this means operating all times "***in a manner consistent with safety and good air pollution control practices for minimizing emissions***." (emphasis added). As Congress plainly stated, "MACT is not intended to require unsafe control measures." H.R. Rep. 101-490(I), at 328 (1990).

Unsafe control measures are exactly what the panel majority sanctioned in denying a stay. EPA's Final Rule absurdly requires the industry to limit the number of ***unplanned*** safety valve openings. The entire purpose of these valves is to provide an emergency pressure release to avoid catastrophic explosions. Preventing industry from minimizing explosions is both inconsistent with the CAA and the essence of arbitrary and capricious rulemaking. Without a stay, the panel majority has put the industry in an untenable position, forcing ***intentional*** noncompliance with arbitrary limits to protect workers and the community at large. *See* EPA Response, #2070301 at 35-36 (absurdly instructing industry that "if a facility were to ignore the Rule's work practice standards...the consequence would be a penalty, not an explosion.") Intentional noncompliance could even be viewed as a criminal act, forcing industry to choose between preserving life and facing criminal allegations. *See* CAA §113(c)(1). EPA asserted in August it would "soon" issue Federal Register notices

correcting multiple aspects of the Rule and reconsidering additional aspects, including unplanned bleeder valve requirements, "within the next few months." EPA Response, #2070301, at Ex. A, p.2. But EPA has yet to publish either.

Second, the panel dissent appropriately acknowledged that EPA determined in 2020 that the integrated iron and steel source category does not pose unacceptable risks to public health and the environment. *See* Order, #2081727, at 3 (Walker, J., dissenting). This determination was not reversed in the Final Rule. Yet, the panel majority's refusal to grant a stay unnecessarily results in exactly such unacceptable risks to public health and the environment. Because there is no established technology to achieve the Final Rule's unprecedented new limits, Petitioners must immediately proceed with pilot testing to develop novel technologies. *See, e.g*., Cleveland-Cliffs' Mot. for Stay, #2062303, Ex. F. One such example is Activated Carbon Injection ("ACI") at sinter/recycling plants. Industry documented that ACI threatens to increase emissions of particle bound mercury, a form of mercury that has the potential to deposit in local communities, causing more harm than good. That cannot be what Congress intended in promulgating the CAA to "protect and enhance our nation's air resources." CAA §101(b)(1).

It is exceptionally important to resolve these issues ***before*** industry must make a Hobson's choice between the safety of their workers and the public and chasing

compliance with the flawed Final Rule. That exceptionally important issue warrants *en banc* review.

**III.  The Panel Majority's Failure to Recognize the Severe Harm Posed to the Domestic Steel Industry Absent a Stay is an Issue of Exceptional Importance.**

Absent a stay, Petitioners must divert significant unrecoverable resources to develop novel technology it may ultimately never use to attempt to achieve compliance with a Final Rule likely to be vacated on the merits. The dissent appropriately recognized that this causes irreparable harm "by forcing applicants to develop novel technology" and spend money "they will not get back, even if they ultimately win." Order, #2081727, at 3 (citing *Ohio v. EPA*, 603 U.S. 279, 292 (2024)).

The scope of these unrecoverable costs, which the Supreme Court has recognized as qualifying as irreparable harm in *Ohio v. EPA*, is startling. The industry faces investments that reach "upwards of $3.2 billion total capital investment, $749 million in annualized costs for point sources." Cleveland-Cliffs' Mot. for Stay, #2062303, p.17. EPA promulgated emission standards and work practices that are erroneously derived, unrepresentative, technically unachievable, and economically unreasonable. *See id*. at 8. The panel majority's failure to stay the rulemaking has real-world consequences for a vital U.S. industry that provides over two million jobs and over $520 billion in economic output. *See id*. at 6. Multiple

members of Congress cautioned the Agency that reconsideration of the Final Rule is necessary to ensure "the regulations do not induce unintended consequences, such as loss of domestic steelmaking capacity and jobs … and do not undermine the competitiveness of the industry." *Id*. at Ex. I. The irreparable harm faced by the domestic steelmaking industry is not unique to this Final Rule, but ripples across the steel industry's suppliers of raw materials and refined ingredients. Additionally, EPA's misinterpretation of the CAA immediately implicates other rulemakings subject to comparable challenges in the D.C. Circuit.[3] This matter of exceptional importance puts the entire iron and steel industry and associated supply chains at risk.

With compliance deadlines impending in April 2025, an immediate stay is needed. A rehearing *en banc* for this Final Rule presents an opportunity to establish a uniform approach to staying a federal rule that relies on the *Chevron* deference overruled by the Supreme Court. Courts must have an opportunity to assess the agency's statutory interpretation before forcing the regulated community to expend critical resources. The impact of the Final Rule, combined with near-simultaneous

---

[3] The rulemakings in question collectively include: (1) *NESHAP: Taconite Iron Ore Processing*, 89 Fed. Reg. 16,408 (March 6, 2024); (2) *NESHAP: Integrated Iron and Steel Manufacturing Facilities*, 89 Fed. Reg. 23,294 (April 3, 2024); and (3) *NESHAP for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries; Residual Risk and Technology Review, and Periodic Technology Review,* 89 Fed. Reg. 55,684 (July 5, 2024).

rulemakings for taconite processing and coke production, imposes immediate cumulative risk on the viability of domestic steel production. Action is needed by this Court to prevent this imminent, and unwarranted harm.

## CONCLUSION

The divided panel's stay denial places industry in the untenable position where it cannot comply with an unachievable rule that violates the CAA several times over. However, the industry is being forced to do just that – the impossible – at the risk of worker safety, community health, regulatory noncompliance, and material financial and economic impairment of a strategic industry. The failure of the panel majority to stay the Final Rule cannot stand. It is of exceptional importance to give industry a path forward that is consistent with the CAA and, as such, is achievable. Petitioners respectfully request the Court grant a rehearing *en banc* for a stay of the Final Rule pending judicial review.

Respectfully submitted,

/s/ Lianne Mantione
Lianne Mantione
Douglas A. McWilliams
Allen A. Kacenjar
Squire Patton Boggs (US) LLP
1000 Key Tower, 127 Public Square
Cleveland, OH 44114
Telephone: (216) 479-8500
lianne.mantione@squirepb.com

*Counsel for Petitioner*
*Cleveland-Cliffs Inc.*

/s/ John D. Lazzaretti
John D. Lazzaretti
Squire Patton Boggs (US) LLP
1000 Key Tower, 127 Public Square
Cleveland, OH 44114
Telephone: (216) 479-8500
john.lazzaretti@squirepb.com

*Counsel for Petitioner*
*United States Steel Corporation*

- 17 -

## CERTIFICATE OF COMPLIANCE

I certify that the Joint Petition for Rehearing *En Banc* of Order Denying Motions for Stay complies with the type-volume limitation of Fed. Rule App. Proc. 35(b)(2) because it contains 3,825 words, excluding the parts exempted by Fed. Rule App. Proc. 32(f).

I also certify that this document complies with the requirements of Fed. Rule App. Proc. 32(c)(2), including the typeface requirements of 32(a)(5) and the type-style requirements of 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14-pt font.

Dated: December 6, 2024                         Respectfully submitted,

/s/ Lianne Mantione                            /s/ John D. Lazzaretti
Lianne Mantione                                John D. Lazzaretti
Douglas A. McWilliams                          Squire Patton Boggs (US) LLP
Allen A. Kacenjar                              1000 Key Tower, 127 Public Square
Squire Patton Boggs (US) LLP                   Cleveland, OH 44114
1000 Key Tower, 127 Public Square              Telephone: (216) 479-8500
Cleveland, OH 44114                            john.lazzaretti@squirepb.com
Telephone: (216) 479-8500
lianne.mantione@squirepb.com

*Counsel for Petitioner*                       *Counsel for Petitioner*
*Cleveland-Cliffs Inc.*                        *United States Steel Corporation*

- 18 -

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rules 35(c) and 28(a)(1)(A), Petitioner Cleveland-Cliffs Inc. certifies as follows:

### Parties and Amici

There was no action in the district court, thus there were no parties in the district court. The parties before the Court in this consolidated proceeding are Petitioner Cleveland-Cliffs Inc. (Case No. 24-1170); Petitioner U. S. Steel (Case No. 1171); Petitioners Clean Air Council, Gary Advocates for Responsible Development, Hoosier Environmental Council, Sierra Club (Case No. 24-1177); and Respondents U.S. Environmental Protection Agency ("EPA"), and Michael S. Regan, EPA Administrator (Case Nos. 24-1170, 24-1171, 24-1177).

On October 2, 2024, the Court entered an Order granting the following parties leave to intervene: American Iron and Steel Institute (Case No. 24-1177); Clean Air Council, Hoosier Environmental Council, Sierra Club, Gary Advocates for Responsible Development, and Just Transition Northwest Indiana (Case Nos. 24-1170 and 24-1171); and United States Steel Corporation (Case No. 24-1177).

### Rulings under Review

The ruling at issue is Respondents' final action entitled "National Emission Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities Technology Review," 89 Fed. Reg. 23,294 (April 3, 2024).

**Related Cases**

These consolidated cases have not previously been before this Court or any other court. As indicated above, this proceeding is related to and consolidated with the following, which are petitions for review of the same final action:

1. *United States Steel Corporation v. U.S. EPA*, Case No. 24-1171 (D.C. Cir.)

2. *Clean Air Council, et al. v. U.S. EPA*, Case No. 24-1177 (D.C. Cir.)

The following cases are pending that, while challenging a different rule, involve National Emission Standards for Hazardous Air Pollutants requirements for integrated iron and steel manufacturing facilities and so may involve some similar issues:

1. *American Iron and Steel Institute, et al. v. U.S. EPA*, 20-1354 (D.C. Cir.)

2. *Clean Air Council, et al. v. U.S. EPA*, 20-1355 (D.C. Cir.)

3. *Hoosier Environmental Council, et al. v. U.S. EPA*, 19-1211 (D.C. Cir.)

Dated: December 6, 2024                    Respectfully submitted,

/s/ Lianne Mantione
Lianne Mantione
Douglas A. McWilliams
Allen A. Kacenjar
Squire Patton Boggs (US) LLP
1000 Key Tower, 127 Public Square
Cleveland, OH 44114
Telephone: (216) 479-8500
lianne.mantione@squirepb.com

*Counsel for Petitioner*
*Cleveland-Cliffs Inc.*

/s/ John D. Lazzaretti
John D. Lazzaretti
Squire Patton Boggs (US) LLP
1000 Key Tower, 127 Public Square
Cleveland, OH 44114
Telephone: (216) 479-8500
john.lazzaretti@squirepb.com

*Counsel for Petitioner*
*United States Steel Corporation*

- 20 -

**DISCLOSURE STATEMENT PURSUANT TO RULE 26.1**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rules 26.1 and 35(c), the undersigned counsel represents:

 Petitioner Cleveland-Cliffs Inc. is a publicly held, non-governmental corporate party to the above-captioned proceeding. No parent corporation owns 10% or more of Petitioner's stock.  Blackrock, Inc., a publicly held corporation, owns 10% or more of Petitioner's stock.

Petitioner United States Steel Corporation is organized under the laws of Delaware and its corporate headquarters are located at 600 Grant Street, Pittsburgh, PA 15219.  United States Steel Corporation produces iron and steel products for the automotive, construction, appliance, energy, containers, and packaging industries. United States Steel Corporation is a publicly held company that has no parent corporation. The following publicly held company has a 10% or greater ownership interest in it:  BlackRock, Inc.

Dated: December 6, 2024                        Respectfully submitted,

/s/ Lianne Mantione                              /s/ John D. Lazzaretti
Lianne Mantione                                  John D. Lazzaretti
Douglas A. McWilliams                            Squire Patton Boggs (US) LLP
Allen A. Kacenjar                                1000 Key Tower, 127 Public Square
Squire Patton Boggs (US) LLP                     Cleveland, OH 44114
1000 Key Tower, 127 Public Square                Telephone: (216) 479-8500
Cleveland, OH 44114                              john.lazzaretti@squirepb.com
Telephone: (216) 479-8500
lianne.mantione@squirepb.com
                                                 *Counsel for Petitioner*
*Counsel for Petitioner Cleveland-Cliffs Inc.*   *United States Steel Corporation*

- 21 -

## CERTIFICATE OF SERVICE

I hereby certify that on December 6, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/ Lianne Mantione
Lianne Mantione
*Counsel for Petitioner Cleveland-Cliffs Inc.*

# EXHIBIT A

***Cleveland-Cliffs Inc. v. U.S. Environmental Protection Agency, et al.***
**Case No. 24-1170 (lead)**
**(consolidated with Nos. 24-1171, 24-1177)**

_____

**D.C. Circuit Order (October 24, 2024)**
**Document #2081727**

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 24-1170**                    **September Term, 2024**

**EPA-89FR23294**

**Filed On:** October 24, 2024

Cleveland-Cliffs, Inc.,

        Petitioner

    v.

Environmental Protection Agency and
Michael S. Regan, Administrator, United
States Environmental Protection Agency,

        Respondents

------------------------------

Consolidated with 24-1171, 24-1177

    **BEFORE:** Pillard, Walker*, and Pan, Circuit Judges

### O R D E R

    Upon consideration of the motions for stay pending review, the oppositions thereto, and the replies, it is

    **ORDERED** that the motions for stay be denied. Petitioners have not satisfied the stringent requirements for a stay pending court review. See Nken v. Holder, 556 U.S. 418, 434 (2009); D.C. Circuit Handbook of Practice and Internal Procedures 33 (2021). It is

    **FURTHER ORDERED**, on the court's own motion, that the parties submit, within 14 days from the date of this order, proposed formats and schedules for the briefing of these cases. The parties are strongly urged to submit a joint proposal and are reminded that the court looks with extreme disfavor on repetitious submissions and will,

* A statement by Circuit Judge Walker, dissenting from this order, is attached.

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**No. 24-1170**                                    **September Term, 2024**

where appropriate, require a joint brief of aligned parties with total words not to exceed the standard allotment for a single brief.  Whether the parties are aligned or have disparate interests, they must provide _detailed_ justifications for any request to file separate briefs or to exceed in the aggregate the standard word allotment.  Requests to exceed the standard word allotment must specify the word allotment necessary for each issue.

**<u>Per Curiam</u>**

FOR THE COURT:
Mark J. Langer, Clerk

BY:    /s/
Selena R. Gancasz
Deputy Clerk

Page 2

WALKER, *Circuit Judge*, dissenting:

The EPA's Final Rule likely violates the Clean Air Act by using fewer than 5 sources to set emission floors. *See* 42 U.S.C. § 7412(d)(3)(B). That error likely forces the applicants to incur "nonrecoverable" compliance costs during the pendency of this litigation — an irreparable harm. *See Ohio v. EPA*, 144 S. Ct. 2040, 2053 (2024). Because the equities and public interest also support the applicants, I would grant the stay motions.

\* \* \*

The Clean Air Act requires the EPA to set emission standards for sources of hazardous air pollutants. 42 U.S.C. § 7412(d). An emission standard "shall require the maximum degree of reduction in emissions" that is "achievable" after considering "the cost of achieving such emission reduction" and other factors. *Id.* § 7412(d)(2). If a source category contains fewer than 30 sources, the emission standard for existing sources "shall not be less stringent," *id.* § 7412(d), than what has already been "achieved by the best performing 5 sources (for which the Administrator has or could reasonably obtain emissions information)." *Id.* § 7412(d)(3)(B). That likely means that an emission floor under § 7412(d)(3)(B) *requires* 5 sources — 5 of the sources "for which the Administrator has or could reasonably obtain emissions information." In other words, if the EPA wants to regulate under § 7412(d)(3)(B), it needs 5 sources.

The EPA cites *National Lime Association v. EPA*, 233 F.3d 625, 633-34 (D.C. Cir. 2000), for the proposition that the EPA must set standards even if it lacks information for 5 sources. EPA Br. at 15. But *National Lime* does not say that those standards must be floors under § 7412(d)(3)(B). The EPA can still regulate under § 7412(d)(2).

Here, the EPA set several emission floors using fewer than 5 sources. EPA Br. at 15; EPA App'x at 19. That was likely contrary to law. Because the EPA lacked information for at least 5 sources, it was required to set an emission standard using the § 7412(d)(2) criteria, which includes a consideration of costs — something the EPA concedes it did not do. EPA Br. at 24.

Absent a stay, the Final Rule will likely cause irreparable harm by forcing applicants to develop novel technology. To develop that technology, the applicants must start spending money now to get in compliance within 1 to 3 years (as the Final Rule requires). That is money they will not get back, even if they ultimately win. *See Ohio v. EPA*, 144 S. Ct. at 2053.

Though the EPA says compliance costs will be low, its estimate depends on its belief that the applicants already possess most of the technology necessary to satisfy the new floors. 89 Fed. Reg. 23294, 23315 (Apr. 3, 2024); EPA Br. at 36-38. That premise is itself wrapped up in the questionable merits of the EPA's decision to base those new floors on potential outliers — instead of the 5 sources that § 7412(d)(3)(B) likely requires.

The equities and public interest also support the applicants. The EPA found, only a few years ago, that emissions from these applicants posed no risk to public health beyond an ample margin of safety. 85 Fed. Reg. 42074, 42074 (July 13, 2020).

I respectfully dissent.